IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-39

Filed 4 February 2026

Alamance County, No. 20CVD001016-000

HILLA ZIV COHEN, Plaintiff,

v.

YOSEF HEFETZ, Defendant.

Appeal by defendant from judgment entered 1 June 2024 by Judge Kathryn Whitaker Overby in Alamance County Superior Court. Heard in the Court of Appeals 14 January 2026.

*Steven C. McRae, P.A., by Steven C. McRae, for the plaintiff-appellee.*

*Sandlin Family Law Group, by Deborah Sandlin, for the defendant-appellant.*

TYSON, Judge.

Yosef Hefetz ("Father") appeals from the permanent child custody order entered 1 June 2024 awarding Hilla Ziv Cohen ("Mother") primary custody of their minor child, "Sam," and permitting Mother to relocate to Israel with the child. *See* N.C. R. App. P. 42(b) (pseudonyms used to protect the identity of minors). For the following reasons, we vacate the order and remand for further findings of fact and entry of a new custody order.

**I. Background**

Sam was born on 12 April 2020. Mother is a citizen and resident of North Carolina, but was born in Israel, where her family still lives. Father is a citizen and resident of North Carolina, but is also originally from Israel, where his mother and brother still live.

Mother filed for permanent custody on 10 June 2020. This matter came on for hearing 29 April 2024. The evidence and testimony presented at the hearing tended to show the following.

Mother and Father never married. Father had an extramarital affair while married to the mother of his two daughters, during which time Mother became pregnant with Sam.

While Mother was pregnant, she began experiencing abdominal pains and called Father to drive her to the emergency room. He indicated he was busy at a poker game. Mother drove herself to the emergency room. The mother of Mother, Ms. Hanny Cohen, traveled to North Carolina in March of 2020 to stay with Mother until approximately three months after Sam was born.

Before Sam was born, Mother approached Father about signing a parenting agreement to delineate custody and placement schedules. He did not sign an agreement. Mother asked Defendant if he would like to be listed on Sam's birth certificate, but he did not respond to her request. Father's name is not listed on Sam's birth certificate. Mother asked Father to relinquish his rights to the minor child. He indicated he would think about it, but he ultimately did not agree to relinquish his

rights.  Mother had an emergency cesarean section delivery on 12 April 2020.  Father did not come to the hospital before or after Sam's birth.

The minor child was circumcised on the eighth day, consistent with Jewish tradition, in Durham, North Carolina.  Ms. Hanny Cohen, the mother of Mother from Isreal, was present for the ceremony.  Father participated virtually *via* Zoom video call.

Father first saw Sam in person in April of 2020.  During 2020, Father would visit occasionally with Sam while he was traveling for work.  These visits usually lasted from between 15 to 20 minutes.

Mother requested of Father to agree for her to obtain a passport for Sam.  Father agreed and the passport was issued.  Mother traveled to Israel for approximately six weeks in the fall of 2020 for the holidays.  During this visit, Sam visited with his maternal relatives and with his paternal grandmother.

Within one week of her return to North Carolina, Mother filed a notice of hearing in order to establish visitation arrangements between Father and Sam.  Father saw Sam only two times between late October 2020 and the end of 2020.

Father saw Sam very infrequently during 2021.  Mother and Sam traveled to Israel in the spring of 2021 for Passover.  Sam again visited with his maternal relatives and with his paternal grandmother.

Father requested a paternity test in 2021, which confirmed he is the biological father of Sam.  Mother and Sam traveled to Israel in the fall of 2021 and again in

2022 for the holiday season. Both times, Sam visited with his maternal relatives and with his paternal grandmother.

By November of 2022, the parties agreed on a temporary parenting agreement. Father had six weeks of approximately two and one-half hours with Sam at a public place on alternating weekends. On the last Sunday visit, Father's visit with Sam was at his residence. For the next six weeks, Father had four hours of time with Sam on alternating Saturdays at Father's residence. Beginning on 3 June 2023, Father was to have twenty-four-hour overnight visits with Sam on an alternating weekend basis. For all of the visits between Father and Sam in December of 2022, Father brought along his daughters. Father was habitually late for his visits.

Mother and Sam visited Israel for Passover in March of 2023. Once again, Sam visited with his paternal grandmother and with his maternal relatives.

In April of 2023, Sam turned three years old. Mother's family participated in a hair-cutting ceremony with him, consistent with Jewish tradition. Mother invited Sam's paternal grandmother to this ceremony, but Mother did not invite Father.

In August of 2023 Father purchased a vacation home in Mexico and planned a trip there at the beginning of August 2023. He asked Mother to allow Sam to go on this trip. She did not think it was a good idea for Sam to go on a trip with Father for five days since the three-year-old had previously only spent one night at a time with the Father.

Mother and Sam traveled to Israel in October of 2023. While she was there, Hamas began the war. She stayed almost two weeks longer than she had planned due to the outbreak of the war and travel restrictions. During this time, Father called Mother almost daily.

Mother filed a motion to modify the temporary parenting agreement on 22 December 2023. In the motion, she expressed her desire to relocate to Israel permanently and her belief that she and her son would have a better life there.

The parties entered into a temporary consent order on 4 March 2024. Father received every other weekend from Friday at 6:00 p.m. until Monday drop off at daycare by 10:00 a.m. Father shared placement with Sam during the Passover holiday in April 2024.

On 12 April 2024, Father and one of his daughters came to the celebration of Sam's fourth birthday. Since that time, Father began to spend more time with Sam. They have a good time together. Mother indicated she has stopped asking Father for help with childcare for Sam because he has declined her requests multiple times in the past.

## A. Mother's Assertions

The trial court entered a child custody order on 1 June 2024, finding, in relevant part, the following facts: Mother wishes to relocate to Israel for several reasons. First, she does not have a lot of friends or deep relationships in North Carolina; she avers her real support group is her family in Israel. Mother wishes to

birth another child. She learned *in vitro* fertilization would be free under her health insurance in Israel. Mother wishes to raise Sam in Jewish traditions and religion. Though Israel has been at war since October of 2023, she testified she believes Israel is currently a safer place for Jews than is the United States. She is aware of the mandatory requirement that at age 18 Sam would have to participate in the Israeli Defense Force.

Mother plans to initially live in her mother's home, where there are bedrooms for Mother and Sam. She has an offer for temporary employment with the possibility of it becoming permanent after a three-month probationary period.

Sam understands both English and Hebrew. Mother has not yet researched schools in Israel because Sam was four years old at the hearing and school does not begin until a child is age six in Israel.

### B. Father's Assertions

Father testified and expressed concerns about Sam relocating to Israel with Mother. First, he asserted the country is at war, meaning it could be dangerous to permanently send a child there. Second, Father believes his relationship with Sam will be negatively impacted if he lives there. In particular, he is concerned about the feasibility and costliness of traveling to Israel during the war. Moreover, communication between the parties had already become difficult by 2023. The court found: "There have been times when the parties communicated easily and effectively. By the beginning of 2023 the parties were not communicating well with each other

and chose not to communicate a lot with each other. The parties now use Our Family Wizard to communicate with each other." Third, Father asserts the neighborhood where Mother plans to take Sam, her own mother's neighborhood, is not safe. He testified it is a "high crime neighborhood."

The trial court made over 100 "findings of fact," but only two conclusions of law: (1) jurisdiction was proper; and, (2) Mother and Father are both fit and proper persons to have joint custody of the minor child.

The trial court entered a permanent child custody order, granting joint legal custody to both of the parties, primary physical custody to Mother, and secondary physical custody to Father. The order also permitted Mother to relocate to Israel with Sam. The order arranged a visitation schedule for Father consisting of a few weeks during holidays or summer on select years. Father timely appealed the custody order on 28 June 2024.

## II.    Jurisdiction

This Court possesses jurisdiction pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2023).

## III.    Issues

The question presented is whether the trial court's findings of fact support its conclusions and decision to grant primary custody of Sam to Mother and to permit Mother to relocate to Israel with Sam.

## IV.    Standard of Review

"Whether . . . findings of fact support the trial court's conclusions of law is reviewable *de novo*." *Hall v. Hall*, 188 N.C. App. 527, 530, 655 S.E.2d 901, 904 (2008).

> The findings of fact are conclusive on appeal if there is evidence to support them, even if evidence might sustain findings to the contrary. The evidence upon which the trial court relies must be substantial evidence and be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Everette v. Collins*, 176 N.C. App. 168, 170, 625 S.E.2d 796, 798 (2006) (internal citations omitted).

## V. Analysis

Father argues the order's conclusions of law and findings of fact do not support a grant of primary physical custody to Mother, who is relocating to another jurisdiction. He also argues the trial court erred in making thirty-four out of the 101 findings of fact in the order because they are mere recitations of testimony and must be disregarded by this Court. Because we agree with his first argument, it is unnecessary to reach his second argument.

## A. Conclusions of Law

We first address the issue of whether the order's findings of fact support its conclusions of law to grant primary physical custody to Mother. "Before awarding custody of a child to a particular party, the trial court must conclude as a matter of law that the award of custody to that particular party 'will best promote the interest and welfare of the child.'" *Steele v. Steele*, 36 N.C. App. 601, 604, 244 S.E.2d 466, 468

(1978) (quoting N.C. Gen. Stat. § 50-13.2(a)). Here, the trial court failed to conclude a grant of primary physical custody to Mother with her relocation to Israel was in the "best interest" of the minor child.

The trial court "need not use 'magic words' in its findings of fact or conclusions of law, if the evidence and findings overall make the trial court's basis for its order clear." *In re B.C.T.*, 265 N.C. App. 176, 188, 828 S.E.2d 50, 58 (2019) (citing *Davis v. Davis*, 229 N.C. App. 494, 503, 748 S.E.2d 594, 601 (2013)); *see also Karger v. Wood*, 174 N.C. App. 703, 709, 622 S.E.2d 197, 202 (2005); *Carlton v. Carlton*, 145 N.C. App. 252, 263, 549 S.E.2d 916, 924 (Tyson, J., dissenting), *rev'd per curiam per dissent*, 354 N.C. 561 (2001) ("I decline to read the order appealed from so narrowly as to disregard the incorporated findings, or to constrain the trial court to use certain and specific 'buzz' words or phrases beyond that included in the order.").

A custody order will not fail simply because the trial court neglected to use the specific verbiage of "best interest of the child," as long as the order makes "detailed findings of fact from which an appellate court can determine that the order is in the best interest of the child[.]" *Carpenter v. Carpenter*, 225 N.C. App. 269, 273, 737 S.E.2d 783, 787 (2013) (quoting *Dixon v. Dixon*, 67 N.C. App. 73, 76-77, 312 S.E.2d 669, 672 (1984). To that end, "[t]he quality, not the quantity, of findings is determinative." *Carpenter*, 225 N.C. App. at 273, 737 S.E.2d at 787.

## B. Findings of Fact

Father argues the order cannot support a grant of primary physical custody to Mother for two reasons: (1) the findings of fact fail to resolve the primary disputes between the parties; and, (2) the order fails to make adequate findings of fact addressing the factors in *Ramirez-Barker v. Barker*, 107 N.C. App. 71, 418 S.E.2d 675 (1992), relevant to determining custody upon relocation of a parent to a foreign jurisdiction.

## 1. Primary Disputes

If both parents are fit and proper to share custody, the trial court must by way of its findings "resolve the primary disputes between the parties and . . . explain *why* awarding custody of [the minor child] to [one parent or another] is in [the minor child's] best interest." *Carpenter*, 225 N.C. App. at 278-79, 737 S.E.2d at 790 (emphasis original) (remanding for additional findings where trial court's order failed to explain why awarding primary custody of the minor child to the defendant was in best interest of the child); *In re Kowalzek*, 37 N.C. App. 364, 370, 246 S.E.2d 45, 48 (1978); *Dixon*, 67 N.C. App. at 78, 312 S.E.2d at 672. "[I]f the trial court does not find that there was sufficient credible evidence to resolve an issue, [the findings] should so state. *Carpenter*, 225 N.C. App. at 279, 737 S.E.2d at 790 (citing *Woncik v. Woncik*, 82 N.C. App. 244, 248, 346 S.E.2d 277, 279 (1986)).

Here, the trial court made 101 findings of fact and concluded both parents were fit and proper persons to share custody of Sam. However, many of the findings were recitations of testimony, which "fail to resolve the primary issues raised by the

evidence [bearing] directly upon the child's welfare." *See Carpenter*, 225 N.C. App. at 273, 737 S.E.2d at 787.

The primary disputed issues raised by the evidence regarding the child's welfare in this case were: (1) the relative safety of Sam relocating to Israel versus remaining in the United States; (2) the relative safety of the neighborhood Mother's mother lived in; and, (3) whether Sam's relationship with Father and Father's family would likely suffer if Sam were to relocate to Israel, and the impact of that possibility on Sam's welfare. The order makes recitations as "findings" regarding the evidence and contentions of the witnesses on these issues, but adjudicates and resolves few of them. *Carpenter*, 225 N.C. App. at 274, 737 S.E.2d at 787.

### a. Safety in Israel

The trial court heard from Mother's and Father's mothers and brothers, who were all living and speaking from Israel *via* Webex video conference call, on the issue of Israel's safety in the midst of the Hamas war. The trial court made approximately ten findings addressing the issue:

> 70. The [c]ourt heard from [Mother and Father's] mothers and brothers, who were in Israel . . . . During multiple hours of testimony, the Court never observed any air raid sounds or any evidence of bombing or war.
>
> 71. Israel has been at war since October 7, 2023.
>
> * * *
>
> 73. [Mother's brother] indicated that he has no concerns about his or his family's safety in Israel. He took his

- 11 -

daughter to a show the day before he testified in this case. . . . [He] lives approximately ninety minutes from Gaza and has never been there before.

\* \* \*

80.     [Father's brother] talked about the war and how they were surrounded by missiles, but also talked about his daughter going on a school field trip this week.

81.     [Father's brother] indicated that i[t] i[s] not safe to raise children in Israel right now, but his own children are in Israel . . . .

\* \* \*

84.     [Father]'s mother . . . lives approximately sixty to ninety minutes south of [Mother]'s mother. . . .

\* \* \*

86.     [Father's mother] has lived in Israel for seventy years and has no plans of moving from Israel.

 \* \* \*

88. [Mother's] mother . . . . ha[s] a concrete safety bunker in her home.

\* \* \*

92. [Mother's mother] . . . . has no plans to move from . . . Israel.  She has lived in Israel since she was three months old.

\* \* \*

94.     [Father] has concerns about [Mother] moving to Israel now that Israel is at war.  He did not have the same concerns before October 7, 2023 when the war started. . . .

These findings recognize a dispute, but do not resolve the issue of the extent to

which the war in Israel presents a safety risk to the welfare of the minor child if he were to relocate there, and certainly not the more recent ceasefire. *See Carpenter*, 225 N.C. App at 276, 737 S.E.2d at 783. Most of the findings, excluding #70, 71, and 94, are merely recitations of testimony by various witnesses, are not adjudications of the conflicts in the testimony, and are not proper findings of fact. *Id.* There is sufficient evidence in the record to support adjudicated findings and conclusions on this issue and particularly in light of more recent events in the region,

### b. Safety in Mother's Chosen Residential Area

On the issue of the relative safety risk the specific neighborhood Mother proposed to relocate with Sam, the trial court made the following findings:

> 60.     [Mother] . . . has a plan to first live with her mother at her mother's home . . . .
>
> * * *
>
> 88.     [Mother's] mother . . . is a retired police investigator. She does have a concrete safety bunker in her home.
>
> 89.     [Father] testified that the neighborhood that [Mother's mother] lives in is a high crime neighborhood. [Mother's mother] testified that it used to be a bad neighborhood, but is much better now.
>
> * * *
>
> 92.     [Mother's mother] has no safety concerns about living in [her neighborhood]. She has no plans to move . . .
>
> 93.     [Mother's mother thinks it would take sixty to eighty minutes to travel from [her neighborhood] to the Gaza Strip.

Again, these findings of fact recognize a dispute about safety, but do not adjudicate and resolve the issue. *Id.*

### c. Father's Relationship with Sam

Finally, on the likelihood of Sam's relationship with Father suffering from Sam's move to Israel, Father identified at least two purported obstacles: (1) the feasibility of air travel to Israel during the war; and, (2) the poor quality of communication between the parties.

Father testified to both of these purported issues. On the issue of air travel, he testified a family trip to celebrate his mother's birthday had already been delayed because of restrictions caused by the Hamas attack. He continued:

> A. There's only a few airlines that fly to Israel and out of Israel, and prices are in the sky, and you never know when any situation will escalate. You can reserve now hotels in Italy, and if there is tomorrow escalation, you have to cancel all or lose your money, because there won't be any flights if you even get a flight.

On the issue of communication between the parties, he testified:

> A. We cannot communicate. We can communicate only by Our Family Wizard. And yeah, we can communicate. We can talk. Sometimes we can video call, but even this is not pleasant. . . . It's so hard to do a FaceTime with a kid. And there's so much noise, and again, family. . . . [H]e runs around with cousins and disappears and they have to go chase him with the phone.

The trial court found:

> 67. [Mother] facilitates phone and video calls between [Father] and the minor child. She would continue to do this

if she moved to Israel.

68.    [Mother] testified that she would facilitate visits between [Father] and the minor child during visits by [Father] in Israel.  She would effectuate this intent if she moved to Israel.

74.    . . . [Mother's brother] tries to be a mediator between the parties. [Mother's brother] and [Father] have discussed things, like [Father] paying for a Jewish daycare . . . . However, the parties have not discussed the same.

75.    There have been times when the parties communicated easily and effectively.  By the beginning of 2023 the parties were not communicating well with each other and chose not to communicate a lot with each other. The parties now use Our Family Wizard to communicate with each other.

94.    [Father] has concerns about [Mother] moving to Israel . . . He believes that his relationship with the minor child will be impacted if the minor child lives in Israel.

95.    [Father's mother] traveled from Israel to the United States in February 2024, during the war without problems.

96.    [Father] testified about the costliness of traveling to Israel, but also indicated that he just shipped a Chevy Nova to Israel. [Father] bought a house in Mexico and drove a car there to have in Mexico.  He just bought an $830,000 home in Chapel Hill.  The Court finds that [Father] has the ability to pay for travel to Israel.

98.    . . .  [Father] indicated that his daughters are smitten with the minor child.

100.   [Mother] is not seeking to move to Israel to hamper the relationship between [Father] and the minor child.  She wants to move to be close to her family and her support group.

101.   [Mother] has always included [Father's] family in

visits with the minor child when she traveled to Israel. She intends on continuing with that pattern. [Mother] has already committed to allowing the minor child to travel with [Father] to Europe for [a] birthday celebration. She has indicated how visitations between the minor child and [Father] could work if she moves to Israel.

Unlike with the previous two primary disputes, the trial court's findings are more definitive. Regarding the issue of air travel for visitation, the trial court found and determined Father had an ability to pay for air travel, but did not determine how the unpredictability of it could impact Father's relationship with the minor child. Regarding the issue of communication, the trial court noted communication between the parties had been difficult, but determined and concluded Mother's desire to relocate to Isreal was in good faith, and she had and would facilitate contact between Father, his family, and the minor child.

Ultimately, the findings of fact in the order fail to resolve the primary disputes raised and fail to show how the disputed issues factor into a best interest analysis. *Carpenter*, 225 N.C. App. at 278-79, 737 S.E.2d at 790. When the internal conflicts in the order are not adjudicated and resolved, the order must be vacated and remanded to the trial court for supported findings and conclusions in a new order. *Tuel v. Tuel*, 270 N.C. App. 629, 631, 840 S.E.2d 917, 920 (2020).

### 2. *Ramirez-Barker* Factors

Father also argues the trial court abused its discretion by allowing Mother to relocate to Israel despite failing to make adequate findings of fact addressing the

factors in *Ramirez-Barker v. Barker*, 107 N.C. App. 71, 418 S.E.2d 675 (1992) (*overruled on other grounds*). While we have already determined the order must be vacated on other grounds, we address this argument for the purpose of guiding the trial court upon remand.

> In exercising its discretion in determining the best interest of the child in a relocation case, factors appropriately considered by the trial court include but are not limited to: the advantages of the relocation in terms of its capacity to improve the life of the child; the motives of the custodial parent in seeking the move; the likelihood that the custodial parent will comply with visitation orders when he or she is no longer subject to the jurisdiction of the courts of North Carolina; the integrity of the noncustodial parent in resisting the relocation; and the likelihood that a realistic visitation schedule can be arranged which will preserve and foster the parental relationship with the noncustodial parent. Although most relocations will present both advantages and disadvantages for the child, when the disadvantages are outweighed by the advantages, as determined and weighed by the trial court, the trial court is well within its discretion to permit the relocation.

*Ramirez-Barker*, 107 N.C. App. at 79-80, 418 S.E.2d at 680 (internal citation omitted); *see also Evans v. Evans*, 138 N.C. App. 135, 142, 530 S.E.2d 576, 580 (2000) (quoting *id.*).

We disagree with Father insofar as he contends a relocation custody order is fatally deficient if the trial court fails to make explicit findings addressing each and every *Ramirez-Barker* factor. *Tuel*, 270 N.C. App. at 632, 840 S.E.2d at 920.

Although a trial court may appropriately consider these factors,

the court's primary concern is the furtherance of the welfare and best interests of the child and its placement in the home environment that will be most conducive to the full development of its physical, mental and moral faculties. All other factors, including visit[ation] rights of the other applicant, will be deferred or subordinated to these considerations, and if the child's welfare and best interests will be better promoted by granting permission to remove the child from the State, the court should not hesitate to do so. Naturally, no hard and fast rule can be laid down for making this determination, but each case must be determined upon its own peculiar facts and circumstances.

*Frey v. Best*, 189 N.C. App. 622, 633-34, 659 S.E.2d 60, 69-70 (2008) (internal quotation marks, emphasis, and citations omitted). Nonetheless, the factors in *Ramirez-Barker* "will be highly relevant to the best interest of the child in nearly all of these situations." *Tuel*, 270 N.C. App. at 633, 840 S.E.2d at 921.

Here, the trial court made some supported findings touching on the *Ramirez-Barker* factors. Those findings are as follows:

> 68.   [Mother] testified that she would facilitate visits between [Father] and the minor child during visits by [Father] in Israel. She would effectuate this intent if she moved to Israel.
>
> * * *
>
> 99.   If [Mother] is allowed to move to Israel, the minor child will grow up with a lot of extended family, including grandparents, aunts, uncles and cousins of a similar age.
>
> 100.   [Mother] is not seeking to move to Israel to hamper the relationship between [Father] and the minor child. She wants to move to be close to her family and her support group.

- 18 -

> 101. [Mother] has always included [Father's] family in visits with the minor child when she traveled to Israel. She intends on continuing with that pattern. [Mother] has already committed to allowing the minor child to travel with [Father] to Europe for [a] birthday celebration. She has indicated how visitations between the minor child and [Father] could work if she moves to Israel.

Finding #99 suggests, but does not explicitly state, an advantage in favor of Sam relocating to Israel would be the child would grow up with "a lot of extended family." This is the only explicit finding which conveys a weighing by the trial court of the advantages of relocating to Israel as they pertain to the best interest of the child. Finding #100 shows the trial court examined the motives of Mother in seeking the move and found them to be integrous and in good faith. Finding #68 and #101 relay Mother's habits and commitments regarding visitation between the minor child and Father but needs substantive analysis of the likelihood "that a realistic visitation schedule can be arranged which will preserve and foster the parental relationship with the noncustodial parent." *Ramirez-Barker*, 107 N.C. App. at 80, 418 S.E.2d at 680.

In *Tuel*, this Court reviewed a child custody order containing similar findings regarding the *Ramirez-Barker* factors. There, the trial court awarded primary physical custody of minor children to the mother and allowed her to relocate to Indiana with them. *Tuel*, 270 N.C. App. at 631, 840 S.E.2d at 919. In its custody order, the trial court made abundantly clear its main consideration in granting the mother primary custody and permitting her to move with the children was based on

its finding:

> It would be in the best interest of the minor children for
> them to be able to locate with the plaintiff to Rushville,
> Indiana given the strong ties of the Plaintiff's family and
> other support systems that would assist the Plaintiff with
> the care of the minor children. . . . The plaintiff's parents,
> her mother in particular, are willing and able to provide
> the care for the minor children to alleviate the cost and
> need of outside childcare.

*Id.* at 633, 840 S.E.2d at 921.

Although the trial court in *Tuel* found both the mother and father would be fit and proper to share custody, it gave no explanation why primary custody with the mother would be in the children's best interests other than in reference to the mother's family support network in Indiana. *Id.* Beyond that consideration, the court did not engage in any comparison between Indiana and the father's home in North Carolina, or each area's relative potential to enrich the children's lives. *Id.*

The trial court barely analyzed any of the other *Ramirez-Barker* factors-reciting the factors as findings "without engaging in any substantive analysis of its conclusions or relating them to the best interests of the children." *Id.* at 634, 840 S.E.2d at 921. The order was vacated and remanded for failing to make adequate findings on the *Ramirez-Barker* factors relevant to the material issues raised by the evidence at the hearing. *Id.* at 631, 636-37, 840 S.E.2d at 920, 923.

Here, a large portion of the findings in the order pertain to the nature of the relationships between the parties, the conditions in and their extended families in

Israel, and the minor child. Despite lacking necessary substantive analysis, the quantity and detail of findings on this topic convey the trial court's primary consideration in granting Mother primary custody and permitting her to move with the minor child was based upon the existence of a family support network in Israel. See *Tuel*, 270 N.C. App. at 633, 840 S.E.2d at 921. Without more, the findings of fact in the order do not support a conclusion that relocation to a foreign jurisdiction is in the best interests of the child. *Id.* at 634, 840 S.E.2d at 921-22; *see also Evans*, 138 N.C. App. at 142, 530 S.E.2d at 580 ("When the court fails to find facts so that this Court can determine that the order is adequately supported by competent evidence and the welfare of the child is subserved, then the order entered thereon must be vacated and the case remanded for detailed findings of fact.") (internal quotation marks, alteration, and citation omitted); *Carpenter*, 225 N.C. App. at 273, 737 S.E.2d at 787 ("The quality, not the quantity, of findings is determinative.").

## VI.    Conclusion

The order is vacated and remanded to the trial court for further findings and supported conclusions as analyzed above and not inconsistent therewith. *It is so ordered.*

VACATED AND REMANDED.

Judges WOOD and FREEMAN concur.